**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **UNILOC 2017 LLC,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Case Nos. 2:18-cv-00548, -549, -550, |
| | § | -551, -552, -553 |
| **GOOGLE LLC,** | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FOR**
**LACK OF STANDING AND IMPROPER VENUE**
**UNDER RULES 12(B)(1), 12(B)(3) AND 12(B)(6)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

I.     STATEMENT OF ISSUES TO BE DECIDED (L.R. CV-7(A)(1)) ................................ 3

II.    FACTUAL BACKGROUND ........................................................................................ 3

     A.    The Parties ........................................................................................................ 3

     B.    The Complaints ................................................................................................ 4

III.   UNILOC 2017 LACKS STANDING TO SUE ............................................................ 5

     A.    Several Agreements Have Fractured Ownership of the Patents-in-Suit. ............... 6

     B.    Fortress's Right to Sub-License the Asserted Patents Deprives Uniloc
          2017 of Standing. ............................................................................................ 7

          1.    Multiple "Events of Default" Under the Uniloc Lux-Fortress
               Agreement Have Triggered Fortress's Right to Sub-License. ................... 8

          2.    Fortress's Right to Sub-License Survived Both Uniloc Lux's
               Attempt to Cure and the Parties' Termination of the Agreement. ............. 9

          3.    Fortress's Right to Sub-License the Asserted Patents Deprives
               Uniloc 2017 of Standing. ..................................................................... 10

     C.    If the Court Does Not Dismiss, The Case Should Be Stayed Pending
          Standing Discovery. ........................................................................................ 11

IV.   VENUE IS NOT PROPER IN THE EASTERN DISTRICT OF TEXAS. .................... 11

     A.    Google Has No "Regular and Established Place Of Business" In This
          District. ........................................................................................................ 12

          1.    All GGC Servers with this District Ceased Serving Traffic Before
               Uniloc's December 2018 Complaints. .................................................... 13

          2.    GGC Servers Hosted by Third-Party ISPs Do Not Give Rise to a
               "Regular and Established Place of Business" in this District. ................. 14

               a.    GGC Servers Are Not "Physical Places" of Business ................. 15

               b.    There Is Nothing "Regular and Established" About GGC
                    Servers. ....................................................................................... 17

               c.    ISP Facilities Hosting GGC Servers Are Not a "Place of"
                    Google. ....................................................................................... 18

          3.    Uniloc's Remaining Venue Allegations Fare No Better in Showing
                a "Regular and Established Place of Business" in This District. .............. 20

               a.    Google Fi and Google Voice ...................................................... 20

               b.    Third-Party "Megaport" Facilities and GCI ............................... 21

# TABLE OF CONTENTS
### (continued)

**Page**

|   |   |   |   |
|---|---|---|---|
|   | c. | Repair Centers | 22 |
|   | d. | Other Google Services | 23 |
|   | e. | Operations Outside the District and Pre-Suit | 23 |
|   | B. | Uniloc 2017 Cannot Establish a Nexus Between the Alleged Acts of Infringement and Google's Purported "Regular and Established Place of Business." | 25 |
|   | C. | Uniloc 2017 Insufficiently Alleged An Act Of Infringement In This District In The 550, 551, and 553 Cases. | 26 |

V.     ALTERNATIVELY, THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA ............................................................ 28

VI.    CLAIMS OF PRE-SUIT INDIRECT INFRINGEMENT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE KNOWLEDGE OF THE ASSERTED PATENT ............................................................................................... 29

VII.   THE 549 CASE COMPLAINT SHOULD BE DISMISSED BECAUSE IT ASSERTS A PATENT DECLARED INVALID IN A FINAL JUDGMENT ............... 29

CONCLUSION ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

CASES

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
    2017 WL 3668597 (D. Del. Aug. 24, 2017) ................................................................. 7

*Babbage Holdings, LLC v. Activision Blizzard, Inc.*,
    2014 WL 2115616 (E.D. Tex. May 15, 2014) ............................................................. 29

*Corydoras Techs., LLC v. Apple Inc.*,
    2016 WL 9242435 (E.D. Tex. Nov. 23, 2016) ............................................................ 29

*CUPP Cybersecurity LLC v. Symantec Corp.*,
    2019 WL 1070869 (N.D. Tex. Jan. 16, 2019) ................................................. 15, 16, 17

*DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*,
    70 F. Supp. 3d 808 (E.D. Tex. 2014) ......................................................................... 30

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011) .................................................................................................... 28

*Godo Kaisha IP Bridge 1 v. Intel Corp.*,
    2018 WL 5728524 (E.D. Tex. Aug. 29, 2018) ............................................................ 24

*HomeBingo Network, Inc. v. Chayevsky*,
    428 F. Supp. 2d 1232 (S.D. Ala. 2006) ...................................................................... 17

*In re Cray Inc.*,
    871 F.3d 1355 (Fed. Cir. 2017) .......................................................................... passim

*In re Google, LLC*,
    2018 WL 5536478 (Fed. Cir. Oct. 29, 2018) ............................................................. 15

*In re Google LLC*,
    914 F.3d 1377 (Fed. Cir. 2019) ................................................................................. 26

*In re Hoffmann-La Roche Inc.*,
    587 F.3d 1333 (Fed. Cir. 2009) ................................................................................. 28

*In re Provider Meds, L.L.C.*,
    907 F.3d 845 (5th Cir. 2018)..................................................................................................10

*In re ZTE (USA) Inc.*,
    890 F.3d 1008 (Fed. Cir. 2018)........................................................................................11, 26

*Jeffrey Galion, Inc. v. Joy Mfg. Co.*,
    323 F. Supp. 261 (N.D. W. Va. 1971)..................................................................................25

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
    2019 WL 2292485 (Fed. Cir. May 30, 2019)...............................................................5, 7, 10

*Magee v. Coca-Cola Refreshments USA, Inc.*,
    833 F.3d 530 (5th Cir. 2016)................................................................................................17

*Mendenhall v. Barber–Greene Co.*,
    26 F.3d 1573 (Fed. Cir. 1994) .............................................................................................29

*Moran v. Smith*,
    2016 WL 4033268 (W.D. Tex. July 27, 2016) .....................................................................28

*Morrow v. Microsoft Corp.*,
    499 F.3d 1332 (Fed. Cir. 2007) .........................................................................................5, 8

*Nano-Proprietary, Inc. v. Canon Inc.*,
    537 F.3d 394 (5th Cir. 2008)................................................................................................10

*Novartis AG v. Actavis, Inc.*,
    243 F. Supp. 3d 534 (D. Del. 2017) .....................................................................................10

*Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*,
    2018 WL 1478047 (S.D.N.Y. Mar. 26, 2018) ................................................................12, 18

*Personal Audio, LLC v. Google, Inc.*,
    280 F. Supp. 3d 922 (E.D. Tex. 2017) ...........................................................................passim

*Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*,
    170 F.3d 1373 (Fed. Cir. 1999) ...........................................................................................30

*Rush v. Savchuk*,
    444 U.S. 320 (1980) .............................................................................................................22

*Sanofi v. Watson Labs. Inc.*,
    875 F.3d 636 (Fed. Cir. 2017) ................................................................................28

*Scaramucci v. FMC Corp.*,
    258 F. Supp. 598 (W.D. Okla. 1966) ......................................................................25

*SEVEN Networks, LLC v. Google LLC*,
    315 F. Supp. 3d 933 (E.D. Tex. 2017) ...............................................................passim

*Sicom Systems Ltd. v. Agilent Techs., Inc.*,
    427 F.3d 971 (Fed. Cir. 2005) ..................................................................................5

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
    137 S. Ct. 1514 (2017) ............................................................................................11

*Uniloc USA, Inc. v. Apple, Inc.*,
    No. C 18-00360-WHA (N.D. Cal.) .............................................................................6

*Uniloc USA, Inc. v. HTC Am., Inc.*,
    2018 WL 3008870 (W.D. Wash. June 15, 2018) .....................................................29

*WiAV Sols. LLC v. Motorola*,
    631 F.3d 1257 (Fed. Cir. 2010) ..........................................................................7, 10

## STATUTES

28 U.S.C. § 1400(b) ......................................................................................11, 24, 27

28 U.S.C. § 1404(a) ...............................................................................................28

28 U.S.C. § 1406(a) ...............................................................................................28

35 U.S.C. § 271 .....................................................................................................27

35 U.S.C. § 281 .......................................................................................................5

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 12(b)(1) ........................................................1, 3, 7, 11

Federal Rule of Civil Procedure 12(b)(3) ..............................................................1, 3

Federal Rule of Civil Procedure 12(b)(6) ........................................................1, 3, 7, 11

**INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6), Defendant Google LLC ("Google") is moving to dismiss six pending complaints filed by Uniloc 2017 LLC ("Uniloc 2017") on December 30, 2018 and December 31, 2018 (the "December Complaints") for lack of standing, improper venue, and failure to state a claim for pre-suit indirect infringement.  Google is moving to dismiss the complaint in Case No. 2:18-cv-549 for failure to state a claim due to a final judgment invalidating the patent-in-suit.

To facilitate the Court's review, Google is filing identical papers in each of Case Nos. 2:18-cv-548, -549, -550, -551, -552, and -553.  The present motion is similar to those pending in Uniloc's prior cases against Google with the chief differences here being:  (1) Google's Global Cache ("GGC") servers in the District previously addressed by this Court and relied upon by Uniloc 2017 were no longer serving traffic when Uniloc's December Complaints were filed; (2) the complaints here do not name Uniloc USA, Inc. as a plaintiff; and (3) the present motion addresses the Federal Circuit's recent decision concerning patent standing in the *Lone Star* case.[1]

*First,* Google moves to dismiss the December Complaints for lack of standing.  Uniloc 2017 and its related entities have so complicated and fractured the rights to the asserted patents that they have deprived Uniloc 2017 of standing to sue on them.  The December Complaints name the fourth permutation of Uniloc entities to sue Google.  But Uniloc 2017 still has it wrong.  As a result of a complicated web of agreements involving Uniloc 2017, its financier and related company, Fortress Credit Co. LLC ("Fortress"), the original Uniloc entity Uniloc Luxembourg SA ("Uniloc Lux"), and CF Uniloc Holdings LLC ("CF Uniloc"), Uniloc 2017 lacks sufficient rights to exclude Google.  Thus,

---

[1] Uniloc's 14 earlier complaints against Google were filed on November 17, 2018 and Google moved to dismiss those complaints on April 19, April 26, and May 8, 2019 in Case Nos. 2:18-cv-00491, -00492, -00493, -00494, -00495, -00496, -00497, -00498, -00499, -00500, -00501, -00502, -00503, and -00504.

Uniloc 2017 does not have standing.

*Second*, Google respectfully submits that venue is not proper in this district.  Under *TC Heartland*, venue in a patent case is only proper (1) where the defendant resides, or (2) in a district in which the defendant has a regular and established place of business and has committed acts of infringement.  Google, which has been organized in Delaware since the complaints were filed and has its principal place of business in California, has never resided in this District.  Google does not have any place of "business" in this District, much less one that qualifies as "regular and established" under the standards set forth in *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017).  As this Court has ruled, venue is addressed as of the time of filing of the complaint.  *SEVEN Networks, LLC v. Google LLC,* 315 F. Supp. 3d 933, 941 n.7 (E.D. Tex. 2017).  However, the Google Global Cache edge servers ("GGC servers") in this District that Uniloc 2017 relies upon to support venue and that the Court addressed previously in the *SEVEN* case were "drained" and had not served any traffic for a month prior to Uniloc's filing of the December Complaints.  Because these GGC servers no longer serve content to users, and therefore no longer conduct the "business" that formed the basis of the venue ruling in *SEVEN*, those servers can no longer serve as "regular and established place[s] of business" within the District.  And Uniloc 2017's other venue allegations are even more attenuated: references to remotely administered Google services accessible nationwide, including in this District; relationships with third-parties in the District; scattered equipment that may be in the District; and contacts outside the District and relevant time period.  Nothing in Plaintiffs' allegations satisfies the Federal Circuit's standard in *Cray*.

*Third*, Uniloc 2017's indirect infringement claims based on pre-suit conduct should be dismissed in Case Nos. 2:18-cv-00549, -552, and -553 (the "549 case," "552 case," and "553 case" respectively).  Uniloc 2017 does not even attempt to allege the pre-suit knowledge that is required to

maintain such claims, contending instead only that "Google will have been on notice" of the asserted patents "since, at the latest, the service of this complaint upon Google." *See, e.g.*, 549 case Compl. at 39 (¶ 32).[2]  That is insufficient.  Uniloc 2017 has failed to state a claim for pre-suit indirect infringement.

*Fourth*, in the 549 case, Uniloc 2017 alleges infringement of a patent claim held invalid in a final judgment months before suit was filed here.  That Uniloc 2017 appealed that judgment does not alter its collateral estoppel effect, which warrants dismissal of the 549 case.

## I.       STATEMENT OF ISSUES TO BE DECIDED (L.R. CV-7(A)(1))

1.       Should this case be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because the plaintiffs lack standing to sue?

2.       Should this case be dismissed under Federal Rule of Civil Procedure 12(b)(3) for improper venue over Google in this District?

3.       Assuming this case is not dismissed in its entirety, should Uniloc 2017's pre-suit indirect infringement claims be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to allege knowledge of the patents?

4.       Should Uniloc's claims in the 549 case be dismissed under Federal Rule of Civil Procedure 12(b)(6) due to the collateral estoppel effect of a final judgment declaring the allegedly infringed claim of the asserted patent invalid?

## II.      FACTUAL BACKGROUND

### A.       The Parties

While Google's products and services are accessible across the United States, it neither resides nor has a place of business in the Eastern District of Texas.  Google is an LLC organized in Delaware.

---

[2] Unless otherwise noted, all citations to Uniloc 2017's complaint are to the complaint in the 548 case.  Because the paragraph numbering restarts at page 27 of each complaint challenged here, citations are to page and paragraph number within a complaint.

Ex. B, Orr Declaration ("Orr Decl.") ¶ 5.  Its headquarters and principal place of business are in the Northern District of California.  *Id*. ¶ 4.  Google does not own or lease "any office space, retail space, or other real property in the Eastern District of Texas."  Ex. C, Lim Declaration ("Lim Decl.") ¶ 3.  Google has neither offices nor employees at offices in this District.  Orr Decl. ¶ 8.  Nor does Google possess or control any other physical place of business in this District, including where GGC servers were located, and it does not hold itself out as possessing or controlling such places.

The sole Uniloc entity named as the plaintiff in the six complaints addressed by this motion, Uniloc 2017 LLC, is a Delaware limited liability company.  2:18-cv-00491 Compl. ¶ 1.  Various permutations of Uniloc entities (including Uniloc 2017, Uniloc USA, and Uniloc Licensing USA LLC) have sued telecommunications and mobile device companies for patent infringement across the country, and have previously filed and dismissed several other complaints against Google in this District.  Meanwhile, the ownership of the patents-in-suit has shifted alongside Uniloc's changing corporate and capital structure.  *See infra* Part III.A.

###### B.      The Complaints

On October 1, 2018, Uniloc 2017 and Uniloc Licensing USA LLC ("Uniloc Licensing") filed four separate complaints against Google.  Then, between October 31, 2018 and November 1, 2018, Uniloc 2017, Uniloc Licensing, and Uniloc USA filed another 10 separate complaints against Google.  On November 17, 2018, those initial sets of Uniloc entities dismissed the 14 complaints without prejudice and a different set of Uniloc entities—Uniloc 2017 and Uniloc USA—filed 14 new complaints against Google on the same 14 patents that were asserted in the earlier complaints.  Then, in December 2018, Uniloc 2017 by itself filed seven more complaints against Google, one of which it later dismissed.  2:18-cv-00554, Dkt. 7.  In short, over the course of three months, Uniloc entities filed 35 lawsuits against Google in this District and dismissed 15, with 20 still remaining.

The lawsuits Uniloc filed in December 2018 allege that Google has infringed six different patents through, for example, Google Cloud, Google Photos, Google Chromecast, and Google Search. *See, e.g.*, 2:18-cv-00550 Compl. ¶ 19; 2:18-cv-00548 Compl. ¶ 17; 2:18-cv-00552 Compl. ¶ 17; 2:18-cv-00553 Compl. ¶ 17.   As discussed below, the December Complaints assert the same venue allegations, regardless of the patent asserted or the accused technology.  *See infra* Part IV.A.

## III.   UNILOC 2017 LACKS STANDING TO SUE

Standing to sue at the time the suit is filed is a threshold requirement the plaintiff must satisfy in every federal action.  *Sicom Systems Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005) ("The party bringing the action bears the burden of establishing that it has standing.").  To have standing to bring a patent infringement suit, the plaintiff must suffer an injury-in-fact from a violation of its exclusionary rights.  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340-41 (Fed. Cir. 2007).  Patents are comprised of a "bundle of rights," including the right to enforce the patent—*i.e.*, to exclude others from making, using or selling products covered by the patent—and the right to license or sublicense the patent.  While a patent owner is free to divide and assign this bundle of "rights" as it sees fit, "this does not mean that the chosen method of division will satisfy standing requirements."  *Id.* at 1341 n.8.  To the extent the division deprives a plaintiff of the ability to exclude a defendant or of "substantial rights" to the patent, the plaintiff cannot meet the injury-in-fact requirement or the requirements of 35 U.S.C. § 281, and thus lacks standing.  *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, No. 2018-1581, 2019 WL 2292485, at *1 (Fed. Cir. May 30, 2019).  If a party lacks standing at the time of filing, the action must be dismissed.  *Sicom*, 427 F.3d at 975-76.  Uniloc 2017 did not have standing when the December Complaints were filed and therefore all of those complaints should be dismissed.

**A.     Several Agreements Have Fractured Ownership of the Patents-in-Suit.**

Each of the asserted patents has a complicated assignment history.  Many of the patents were originally assigned to Philips Electronics entities and eventually acquired by Pendragon Wireless, a non-practicing entity.  Uniloc Lux acquired nearly all of the asserted patents from Pendragon Wireless.  While Uniloc Lux eventually transferred rights in the patents to Uniloc 2017, a series of agreements between those and other entities fractured the patent rights irredeemably.[3]

For example, in December 2014, Uniloc Lux and Uniloc USA entered into loan agreements with Fortress to finance the various Uniloc entities' patent assertion activities.[4]  Ex. D, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 168-4 ("Uniloc Lux-Fortress Agreement").  In exchange, Fortress was granted an irrevocable patent license that included the right to grant sublicenses that automatically reverted to Fortress following the occurrence of certain "Events of Default" defined in the contracts.  Ex. E, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 164-2 ("Judge Alsup Order") (citing Unilox Lux-Fortress Agreement § 2.1).  While that agreement was amended several times and terminated in May 2018 (Ex. F, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 168-19 ("Turner  Deposition") at 25:18-22), Fortress—as a result of a number of Events of Default under the agreements described further below—holds the right to grant sublicenses to the asserted patents.

Thereafter, Uniloc Lux purported to assign its patent rights to Uniloc 2017 as of May 3, 2018.  Ex. G, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 120 ("Uniloc Ownership History").  That same day,

---

[3] Google supports its motion with publicly available information obtained from other Uniloc litigation—including *Uniloc USA, Inc. v. Apple, Inc.*, No. C 18-00360-WHA (N.D. Cal.), where a motion to reconsider Judge Alsup's decision on a motion to dismiss is pending.  Uniloc entities have sought to keep documents related to their corporate structure and patent ownership under seal, and documents on which Google relies are partially redacted.  As Judge Alsup noted, "Uniloc's manipulations in allocating rights to the patents-in-suit to various Uniloc (possibly) shell entities is perhaps designed to insulate Uniloc Luxembourg from any award of sanctions."  Ex. E, Judge Alsup Order at 10.  Whatever the reason, neither Uniloc 2017 nor Uniloc USA has standing to sue.

[4] Uniloc 2017 was formed and funded by Fortress to allow Fortress to manage the patent enforcement efforts of the Uniloc patent portfolio.  Fortress and Uniloc 2017 have overlapping personnel, including the same "authorized person" James K. Nobel III, who signed the formation documents for both companies.  *See* Exs. H-I.

Uniloc 2017 entered the first of a series of agreements with Uniloc USA and Uniloc Licensing that purportedly gave Uniloc USA the rights to sue for preexisting litigation and Uniloc Licensing the rights to sue for future litigation.  *Id*.  But Uniloc 2017 terminated both agreements on November 16, 2018. Ex. J, 3:18-cv-03432-JST (N.D. Cal.), Dkt. 36-1 ("Foster Declaration") at ¶ 7.

> **B.**      **Fortress's Right to Sub-License the Asserted Patents Deprives Uniloc 2017 of Standing.**

Uniloc 2017 lacks standing as a result of Uniloc Lux's prior grant of rights to Fortress, including a right to sub-license "following an Event of Default."  Fortress's rights are irrevocable and vested before Uniloc Lux purported to assign the patents to Uniloc 2017.

If an accused infringer "has the ability to obtain" a license to the patent "from another party with the right to grant it," then the plaintiff (here, Uniloc 2017) "does not have an exclusionary right with respect to the alleged infringer and thus is not injured by that alleged infringer."  *WiAV Sols. LLC v. Motorola*, 631 F.3d 1257, 1266 (Fed. Cir. 2010); *see also Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 16-453-RGA, 2017 WL 3668597, at *2 (D. Del. Aug. 24, 2017).

Relying on *WiAV*, the Federal Circuit recently confirmed in *Lone Star* that the question of constitutional standing in patent cases is focused on an injury in fact to the right to exclude a defendant and that a plaintiff's enforcement rights are "illusory" to the extent a non-party can "grant a sublicense and negate [a] lawsuit."  2019 WL 2292485, at *4.  For the same reasons, a plaintiff may not possess "all substantial rights" to a patent, including the ability to exclude a defendant, and therefore lack "statutory standing."  *Id.* at *7-8.  *Lone Star* clarified that the "all substantial rights" question is one of "statutory standing" rather than a constitutional standing and therefore properly considered under Rule 12(b)(6) rather than Rule 12(b)(1).  *Id*.  Here, Uniloc 2017 lacks both constitutional and statutory standing because Fortress's ability to grant sub-licenses negates Uniloc 2017's right to exclude.  *See*

*Morrow*, 499 F.3d at 1340-41.

In 2014, Uniloc Lux entered into a revenue-sharing and patent-license agreement with Fortress that granted Fortress rights in Uniloc Lux's "existing and future acquired Patents," which includes the asserted patents, in exchange for a money loan.  Ex. L, Uniloc Lux-Fortress Patent Security Agreement at §2(a).  As part of the agreement, Fortress was granted an irrevocable license to the patents with the right to sub-license, which it was free to exercise "following an Event of Default" by Uniloc Lux.  Ex. E, Judge Alsup Order at 4, citing Uniloc Lux-Fortress Agreement § 2.1.  As shown below, numerous Events of Default defined under the agreement occurred, resulting in the right to sub-license each of the asserted patents automatically reverting to Fortress, thereby depriving Uniloc 2017 of standing.

### 1. Multiple "Events of Default" Under the Uniloc Lux-Fortress Agreement Have Triggered Fortress's Right to Sub-License.

Publicly available information, including redacted copies of Uniloc Lux-Fortress agreements, discloses multiple defaults.  The first known Events of Default relate to Uniloc Lux's failures to meet the revenue covenant of Section 6.2.2 of the Revenue Sharing Agreement, triggering Fortress's right to sub-license.  *See* Ex. D, Uniloc-Lux Fortress Agreement at §6.2.2.  The agreement has a provision that required Uniloc Lux to reach a specific revenue projection by March 31, 2017.  *Id.*  Uniloc Lux failed to reach that required revenue projection.  Ex. E, Judge Alsup Order at 5; Ex. F, Turner Deposition at 66:4-67:6, 68:15-18.

The agreement also required Uniloc Lux to reach a specific revenue projection by June 30, 2017.  Ex. E, Judge Alsup Order at 5.  Again, Uniloc Lux failed to reach the required revenue projection.  *Id.*

Uniloc Lux's breach of a covenant requiring correct representations regarding the patent portfolio constituted another "Event of Default."  Specifically, under Article IV of the Revenue Sharing Agreement, Uniloc Lux represented that none of the patents had been determined to be invalid or

unenforceable, in whole or in part, and that none was subject to any challenge to validity and enforceability.   *See* Ex. D, Uniloc-Lux Fortress Agreement at §4.5.   Uniloc Lux made these representations when the agreement was first signed on December 30, 2014, and re-affirmed the representations when it signed an amendment on May 15, 2017.   *See* Ex. D, Uniloc-Lux Fortress Agreement; Ex. M, 3:18-cv-360-WHA (N.D. Cal.) Dkt. 168-17 ("Uniloc Lux-Fortress Third Amendment").   As of May 15, 2017, however, at least 7 Uniloc patents had already been found invalid or unenforceable, in whole or in part.   At the same time, another 13 patents were already the subject of lawsuits and re-examination proceedings.   *See e.g.*, Ex. N, 3:18-cv-360-WHA (N.D. Cal.), Dkt. 135-30 ("Summary of Uniloc Patent Challenges").   Thus, Uniloc's May 15, 2017 re-affirmation constituted an "Event of Default."

Fortress was free to exercise its sublicense rights following any one of these Events of Default, all of which pre-date the complaints at issue.

### 2. Fortress's Right to Sub-License Survived Both Uniloc Lux's Attempt to Cure and the Parties' Termination of the Agreement.

While Uniloc Lux and Fortress have attempted to sort out the patent rights through a series of amendments and subsequent agreements in response to various standing challenges, Fortress's right to sub-license persists.   Neither the May 15, 2017 third amendment to their agreement, which Uniloc has asserted cured its Events of Default, nor the May 2018 termination revoked that right.

First, the May 15, 2017 amendment did not cure all of Uniloc's Events of Default, nor could it. For example, it could not cure the Event of Default that did not occur until a revenue milestone was missed a month and a half later on June 30, 2017.   Separately, Uniloc's misrepresentations concerning the validity and enforceability of the patents were made in the May 15, 2017 amendment itself.   But under the original agreement's terms, an amendment can only cure an Event of Default if "its express

terms cure[] such Event of Default." Ex. D, Uniloc-Lux Fortress Agreement at §7.3.  The May 2017 Amendment included no such express terms.  Ex. M, Uniloc Lux-Fortress Third Amendment.  As such, there are at least two Events of Default that Uniloc Lux did not cure.[5]

Second, the May 2018 termination of the Revenue Sharing Agreement did not revoke Fortress's irrevocable right to sub-license the asserted patents.  Termination of an agreement alone does not extinguish an irrevocable license, such as Fortress's here.  *See, e.g., Nano-Proprietary, Inc. v. Canon Inc.,* 537 F.3d 394, 400 (5th Cir. 2008) ("Based upon the unambiguous meaning of 'irrevocable,' we find that the [license] could not be terminated, notwithstanding a material breach of the agreement."); *In re Provider Meds, L.L.C.*, 907 F.3d 845, 856 (5th Cir. 2018) (explaining that the term "irrevocable . . . indicates that the license may not be revoked for any reason").

### 3.   Fortress's Right to Sub-License the Asserted Patents Deprives Uniloc 2017 of Standing.

Because Fortress has an unfettered right to sublicense the asserted patents—including to Google—Uniloc 2017 "does not have an exclusionary right with respect to the alleged infringer [Google] and thus is not injured by" Google.  *WiAV Sols.*, 613 F.3d at 1266-67.  This right renders Uniloc 2017's enforcement rights illusory and it therefore does not hold "all substantial rights" in the asserted patents.  *See Lone Star,* 2019 WL 2292485, at *4.  It is inconsequential that Fortress may say it has no intention of sublicensing the patents to Google.  *Novartis AG v. Actavis, Inc*., 243 F. Supp. 3d 534, 543 (D. Del. 2017) ("While this may establish that NPAG might choose not sublicense to, for example, Defendants, Plaintiffs identify nothing that deprives NPAG of the legal right to do just that.").

---

[5] In the *Apple* litigation from which many of the agreements were collected, Judge Alsup relied on the May 15, 2017 third amendment as evidence that Uniloc Lux cured its Events of Default.  *See* Ex. E, Judge Alsup Order at 6.  That finding is the subject of a reconsideration motion and would not be binding on this Court in any event.  But even if the third amendment cured the March 2017 revenue shortfall occurring before the amendment, that amendment could not cure the two other defaults addressed here.

An irrevocable right to sub-license each of the asserted patents automatically reverted to Fortress before Uniloc 2017 was formed.  Thus, Uniloc 2017 does not have standing to sue and its complaints should be dismissed under Rule 12(b)(1) and Rule 12(b)(6).

### C.    If the Court Does Not Dismiss, The Case Should Be Stayed Pending Standing Discovery.

Based on the publicly available facts, Uniloc 2017 cannot meet its burden to prove it has standing to bring any of the lawsuits filed against Google.  Thus, the Court should dismiss all of the December Complaints.  But, at a minimum, the public facts show that standing is in significant doubt.  Thus, if the Court declines to dismiss (on either standing or venue grounds), Google respectfully requests that it be allowed to take immediate discovery into Uniloc 2017's standing and that all other proceedings be stayed to resolve this threshold issue before additional resources are expended unnecessarily.

## IV.    VENUE IS NOT PROPER IN THE EASTERN DISTRICT OF TEXAS.

In a patent case, venue is proper only "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."  28 U.S.C. § 1400(b).  "[T]he Plaintiff bears the burden of establishing proper venue."  *In re ZTE (USA) Inc*., 890 F.3d 1008, 1013 (Fed. Cir. 2018).  Uniloc 2017 acknowledges that Google is organized in Delaware with a principal place of business in Mountain View, California.  *See* Compl. at 1 (¶ 3).  Therefore, under *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514, 1521 (2017), Google does not reside in this District for purposes of the patent venue statute.  Moreover, as explained below, Uniloc 2017 cannot meet its burden to establish that venue is proper under the "regular and established place of business" prong of the patent venue statute.

**A.      Google Has No "Regular and Established Place Of Business" In This District.**

In *Cray,* the Federal Circuit explained that for a defendant to have a regular and established place of business in a district: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant."  871 F.3d at 1360.  It also cautioned courts applying this test to "be careful not to conflate showings that may be sufficient for other purposes, *e.g.*, personal jurisdiction or the general venue statute, with the necessary showing to establish proper venue in patent cases."  *Id.* at 1361.

The first requirement of the *Cray* test, a physical place, is just that: "a building or a part of a building set apart for any purpose" or "quarters of any kind."  *Id.* at 1362 (citation omitted).  The Federal Circuit emphasized that the statute "cannot be read to refer merely to a virtual space or to electronic communications."  *Id.*  Rather, there must be a "physical, geographical location in the district from which the business of the defendant is carried out."  *Id.*  Moreover, that business must be carried out by employees or agents of the defendant physically present at the place of business.  This is confirmed by the patent service statute, which "presumes that a defendant with a 'place of business' in a district will also have 'agents conducting such business' in that district."  *Peerless Network, Inc. v. Blitz Telecom Consulting*, *LLC*, No. 17-CV-1725 (JPO), 2018 WL 1478047, at *4 (S.D.N.Y. Mar. 26, 2018) (quoting 28 U.S.C. § 1694).

The second requirement, that the physical place of business be "regular and established," means that the business "operates in a steady, uniform, orderly, and methodical manner" and that the place where that business is carried out is "settled certainly, or fixed permanently."  *Cray,* 871 F.3d at 1362-63.  "[W]hile a business can certainly move its location, it must for a meaningful time period be stable, established."  *Id.* at 1363.

The third requirement is that the alleged place of business be a "place *of the defendant*." *Id.* "Relevant considerations include whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place." *Id.* "Marketing or advertisements also may be relevant, but only to the extent they indicate that the defendant itself holds out a place for its business." *Id.* For example, if a defendant "lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself," that could support a finding that this requirement is met. *Id.* at 1363-64.

All three requirements must be met to establish that Google has a "place of business" in this District. *Id.* at 1362. None of Uniloc 2017's many venue allegations meet these three requirements.

### 1.     All GGC Servers with this District Ceased Serving Traffic Before Uniloc's December 2018 Complaints.

While Google acknowledges that the Court is not writing on a blank slate when it comes to GGC servers, which form the backbone of Uniloc 2017's venue allegations, there have been subsequent factual developments that affect this Court's venue analysis.   In *SEVEN*, the Court determined that GGC servers present within the District constituted "physical places" that were "regular established" and "of Google's" such that venue was proper as to Google.  315 F. Supp. 3d at 947-66.  In particular, the Court found that:

> [T]he GGC servers are best characterized as local data warehouses, storing information in local districts to provide Google's users with quick access to the cached data, avoiding the delays associated with distant data retrieval from Google Data Centers. This type of logistical positioning is commonplace for larger corporate interests, especially where prompt delivery is a core aspect of a business strategy. This is the case with Google. Holding that Google's business done at and through the GGC servers faithfully comports with the language of the statute; it is the logical result this Court has reached.

*Id.* at 960-61. Google respectfully disagrees that GGC servers can be a "regular and established place of business," but, even assuming they can be, the facts underpinning the *SEVEN* decision are no longer true.

The present complaints were filed on December 30 and 31, 2018. As this Court noted in *SEVEN*, "[v]enue is assessed as of the time of filing of the complaint." 315 F. Supp. 3d at 941 n.7; *see also Personal Audio, LLC v. Google, Inc.,* 280 F. Supp. 3d 922, 924 (E.D. Tex. 2017) ("The Court concludes that the burden of proof is on Plaintiff and that the venue facts are to be examined as of the date the suit filed."). Thus, the relevant date for any venue analysis is December 30 or 31, 2018. As of November 23, 2018, more than a month before Uniloc 2017 filed these complaints, the GGC servers within this District were "drained"--a process used to take servers out of service--and had ceased serving traffic or cached content. Ex. O, McCallion Decl. ¶ 13. Thus, the GGC servers within the District no longer served data to users as of the filing of the December Complaints, *id.*, and therefore no longer conduct the "business" that formed the basis of the venue ruling in *SEVEN*. Uniloc 2017 cannot rely on the drained GGC servers to sustain its burden of showing that Google has a "regular and established place of business" in this District.

### 2. GGC Servers Hosted by Third-Party ISPs Do Not Give Rise to a "Regular and Established Place of Business" in this District.

Google respectfully submits that, whether or not the GGC servers were serving traffic in this District, the GGC servers do not give rise to a "regular and established place of business" within this District. In *Personal Audio*, Judge Clark of this District held that Google's GGC servers did not create a "regular and established place of business" in view of the factors identified by the Federal Circuit in *Cray*. 280 F. Supp. 3d at 925, 932-35. In reaching that result, Judge Clark explained that "conclud[ing] that Google's business was being carried out by these servers would have far-reaching consequences

that distort the scope of the statute; for example, every single AT&T tower would then possibly become a place of business for AT&T." *Id.* at 934.  The *SEVEN Networks* decision acknowledged that it conflicted with *Personal Audio* on identical facts.  315 F. Supp. 3d at 950.  And after a divided Federal Circuit panel declined mandamus review of *SEVEN Networks*, finding it "appropriate to allow the issue to percolate in the district courts," *In re Google*, *LLC,* No. 2018-152, 2018 WL 5536478, at *3 (Fed. Cir. Oct. 29, 2018), Chief Judge Lynn in the Northern District has since agreed with *Personal Audio* that servers at a third-party's data center do not constitute a "regular and established place of business." *CUPP Cybersecurity LLC v. Symantec Corp.,* C.A. No. 3:18-CV-01554-M, 2019 WL 1070869, at *2-3 (N.D. Tex. Jan. 16, 2019); *see also* Ex. A, *BMC*, No. 1:17-cv-1074, Dkt. 55 at 5-6 (E.D. Va. Dec. 21, 2017) ("rent[ing] a server rack from a third party" does not establish a "place of the defendant").  Google respectfully submits that the majority position is the correct one.  Regardless, the GGC servers in this District were no longer serving traffic as of the complaints here and therefore do not support venue under either approach.

### a.    GGC Servers Are Not "Physical Places" of Business

Even when GGC servers in this District were serving traffic, they were just one part of a tiered network of computer infrastructure that allows Google to quickly and reliably deliver content to Internet users.  The core of this network is Google's data centers, which provide computation and backend storage.  Ex. O, McCallion Declaration ("McCallion Decl.") ¶ 3.  There are a handful of Google data centers in the U.S.—none in Texas.  *Id.*, Ex. C, Lim Decl. ¶ 4.  The next tier of Google's network infrastructure is known as "Edge Points of Presence" ("PoPs"), which connect Google's network to the rest of the Internet.  Ex. O, McCallion Decl. ¶ 4.  Google has no PoPs in this District.  *Id.*

The last tier of the network consists of the GGC servers or "edge nodes."  Ex. O, McCallion Decl. ¶ 5.  Local Internet Service Providers ("ISPs") host GGC servers at the ISPs' own facilities.  *Id.*

¶ 6.  If a third-party ISP chooses to host a GGC server, then portions of certain digital content that are popular with the ISP's subscribers can be temporarily "cached" on that GGC server, relieving the ISP of the need to use medium or long-haul network capacity to fetch the content from outside its network. *Id.*  GGC servers are not necessary for the delivery of Google content to users.  *Id*. at ¶ 5.

GGC servers are not computers made by Google; rather, they are off-the-shelf computers made by third-party manufacturers and typically shipped directly to ISPs by third parties.  Ex. O, McCallion Decl. ¶ 9.  After receiving the GGC servers, the ISP unpacks, locates, installs, and hosts them in its own facility.  *Id.*  Google does not own, lease, or control the space where the servers are kept.  *Id.*  ¶ 10.  No Google employee has ever seen or visited the servers previously operating in this District.  *Id.*  Indeed, Google did not have rights to physically access the spaces in which the GGC servers were stored while its service agreements with the ISPs are in force.  *Id.* ¶ 12.  And those service agreements could have been terminated "at any time" for the convenience of either party.  *Id.*

Apart from *SEVEN Networks*, every decision to address servers has held that they do not constitute a physical place of business as required under *Cray*.  GGC servers are "'hardware,' the physical electronic equipment used to operate the internet," as opposed to "'places' under the meaning of the statute," and "therefore cannot establish a regular and established place of business in this district."  *Personal Audio*, 280 F. Supp. 3d at 934 (holding GGC servers are insufficient to establish venue).  *BMC* similarly held that "[s]ervers are not real property; they are personal property.  To the extent the servers provide 'space' from which a business may operate, any such space would be virtual space and virtual space explicitly fails the *Cray* test."  Ex. A, *BMC* at 4.  Most recently, in *CUPP*, the Northern District held that servers are not a "place" because the "business conducted" by servers "involves electronic communications, which the Federal Circuit specifically stated cannot constitute a place."  *CUPP*, 2019 WL 1070869, at *3.  But even the construct of providing a "virtual space" is no

longer an apt description here; the servers are no longer serving any content to users and do not qualify as space, virtual or otherwise.

Assuming GGC servers could be said to take up some amount of physical space, they still are not "places of business" under *Cray*.  Servers are pieces of equipment—like slot machines or vending machines—not places where employees conduct business—such as an office, storefront or factory. *HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp. 2d 1232, 1250 (S.D. Ala. 2006) ("That an individual may be a part owner of a piece of equipment (in this case, a slot machine) located in a judicial district does not render the situs of that equipment his regular and established place of business for venue purposes."); *Magee v. Coca-Cola Refreshments USA, Inc.,* 833 F.3d 530, 534 (5th Cir. 2016) (finding "vending machines are not 'sales establishments,'" and defining "establishment" as "a place of business or residence with its furnishings and staff").  "The servers themselves are not places from which [Google] conducts its business."  *CUPP*, 2019 WL 1070869, at *3.  This is especially true here, where the GGC servers were not serving traffic at the time the complaints were filed (or after).  To the extent any drained GGC equipment physically remained in the District after the complaints were filed in December 2018, it was not available to be used by any customer (unlike, for example, a slot machine or vending machine).  Therefore, even under Uniloc's own theory, the GGCs were not a place of business.

### b.      There Is Nothing "Regular and Established" About GGC Servers.

Even if GGC servers located on third-party ISPs' server racks could meet *Cray*'s first requirement of a "physical place" of business, that place of business must be "regular and established." *Cray*, 871 F.3d at 1360.  A regularly operating business means one that "operates in a steady, uniform, orderly, and methodical manner," while an "established" place means "settled certainly, or fixed permanently." *Id.* at 1362-63.  But here, when they were serving traffic, GGC servers simply stored or

"cached" popular digital content on a temporary basis, and could not operate independently of a Google data center located out of the District.  Ex. O, McCallion Decl. ¶¶ 5-6.  Even when Google data previously moved through GGC servers, Google did not "regularly" conduct business from server racks in third-party facilities.  *See Peerless,* 2018 WL 1478047, at *3-4 (finding "equipment … involved in processing calls to and from New York-based phone numbers" stored on a shelf at a third-party facility was not a "regular and established place of business").

Nor could the GGC servers have been "established" within *Cray*'s meaning.  The contracts with the ISPs were able to be terminated "at any time" for the convenience of either party.  Ex. O, McCallion Decl. ¶ 12.  And in fact, the handful of GGC servers that were previously active in this District ceased serving traffic in November 2018.  Moreover, the fact that these GGC servers were easily "drained" evidences the impermanent nature of the GGC servers.  *Id.* ¶ 13.  Personal property designed to temporarily hold electronic data stored on the shelf of a third party under a services agreement that could have been terminated by either party at will is insufficient to establish that Google had a "permanently fixed" "place" in this District.  *Cray*, 871 F.3d at 1363.

### c.    ISP Facilities Hosting GGC Servers Are Not a "Place *of*" *Google.*

To satisfy *Cray*'s third requirement—"that 'the regular and established place of business' must be 'the place of the defendant'"—the "defendant must establish or ratify the place of business" in question.  *Cray*, 871 F.3d at 1363.  "Relevant considerations include whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place." *Id.*  To begin, GGC servers are not places; they are things.  ISPs install, store, and maintain them.  Ex. O, McCallion Decl. ¶¶ 9, 12.  No Google employee ever even saw the GGC servers in question.  *Id.* ¶ 10.  The servers were shipped by a third-party to the ISP, who set them up, determined where they would be placed, and

then supplied power, network interfaces, and IP addresses to the servers.  *Id*. ¶¶ 9, 12.  And for more than a month before this suit was filed, the servers had ceased serving data to users.

As for the only places possibly at issue in connection with the GGC servers—the real estate that has housed the GGC servers—Defendants neither own nor lease the ISP's facilities.  The ISPs agree to "provide" "rack space" for the equipment, which is located "***in the Host's***" facilities—physical property locations owned or leased by the ISP.  Ex. O, McCallion Decl. ¶ 12.  For an ISP merely to provide rack space for equipment—at a physical place of the ISP's choosing—does not give Google a "lease" or control over the space in which the servers sit.  In fact, Google does not even have physical access to—much less control over—the rooms holding the racks and servers.  The racks are in the ISP's facilities and Google does not have a key.  *Id.*  The contract only grants Google access if the agreement is terminated and the ISP fails to deliver the servers to Google.  *Id.*  Then, and only then, may Google enter any premises of a host where such equipment is located during normal working hours.  *Id.*

Other "[p]otentially relevant inquiries" in determining whether a location is a "place of business" of the defendant "include whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself."  *Cray*, 871 F.3d at 1363-64.  Google has done none of those things.  There is no Google "sign" or other indication on any ISP-owned or leased facility containing GGC servers that the facility is a place of business of Google.[6]  Finally, courts may consider "the nature and activity of the alleged place of business . . . *in comparison with* that of other places of business of the defendant in other

---

[6] Both *SEVEN Networks* and Uniloc's complaint point to Google Maps noting that ISPs deploy GGC servers in their network in certain metro areas in this District, suggesting that this constitutes a ratification of the ISP's location as Google's place of business.  *See SEVEN Networks*, 315 F. Supp. 3d at 966 n.51; Compl. at 7-8 (¶ 21).  But as Google's website explains, GGC servers are deployed by network operators and ISPs (independently owned and operated businesses), not Google.  *See* https://peering.google.com/#/infrastructure (compare with Google's language regarding Data Centers that Google "operates").  Rather than associating itself with a specific place of business, such as an ISP, Google refers generally to the scope of its network infrastructure.  In fact, the places identified on Google's website are not even the locations of the ISPs, but rather the airports closest to the servers.

venues." *Id.* at 1364 (emphasis in original).  GGC servers are located in many judicial districts in the country, while the GGC servers previously serving traffic in this District constituted a fraction of one percent of the total serving capacity of Google's network in the U.S.  Ex. O, McCallion Decl. ¶ 7.  On the other hand, actual Google facilities, such as its offices and data centers, are found in far fewer locations, and none are located in the District.  *Id.* ¶ 3; Ex. C, Lim Decl. ¶¶ 3-5.  .  GGC servers, even when serving traffic, were not a legally sufficient basis for venue under *Cray.*

### 3. Uniloc's Remaining Venue Allegations Fare No Better in Showing a "Regular and Established Place of Business" in This District.

Uniloc attempts to supplement its GGC server allegations with a variety of Google services and relationships (including past relationships) that it claims establish a "regular and established place of business" in this District.  None passes the *Cray* test.

#### a. Google Fi and Google Voice

Uniloc 2017 points to Google's "wireless phone services called Google Fi" that Google provides to its customers "for cities such as Tyler and Marshall, TX."  Compl. at 10 (¶ 34).  But Google Fi is a Mobile Virtual Network Operator ("MVNO"), a cellular service provider that contracts to resell services from a cellular carrier's network (AT&T, T-Mobile, Verizon or Sprint).  Google Fi is not a "physical place" of business, such as "a building or a part of a building," but is instead a service provided to Google users.  Google Fi relies on cellular towers of other companies to transmit data; Google does not own any cell towers in this District.[7]  Ex. P, Arscott Declaration ("Arscott Decl.") ¶ 4.  Google does not have any exclusive rights to use the cell towers.  Ex. P, Arscott Decl. ¶¶ 4-5.  And Google has no say as to where the towers are located or how they are operated.  *Id.* ¶ 5.  Thus, the

---

[7] Moreover, as *Personal Audio* recognized, holding that "every single AT&T tower" is "a place of business for AT&T" would "distort the scope of the statute."  280 F. Supp. 3d at 934.  Of course, Google does not even own the cell towers here; AT&T and other carriers do.  Regardless of the role Google plays in routing traffic through the towers of carriers or other third party equipment, the property of those third-parties is not Google's regular and established place of business.

Google Fi service fails at each step of the *Cray* test.  It consists of the transmission of "electronic communications," not a "physical place" of business.  *Cray*, 871 F.3d at 1362.  Because Google neither owns the cell towers, nor has any say over where they are located or how they are operated, the towers cannot be a "regular and established" place of business for Google.  *Id.* at 1362-63.  And the fact that Google does not own, lease, or exercise control over the place of the cell towers means the cell towers used by Google Fi have not been established or ratified by Google as a place of business.  *Id.* at 1363.

As for Google Voice, Uniloc 2017 simply alleges that Google provides "telephone services to residents in this District" through the service by allowing selection of local numbers.  Compl. at 25 (¶ 64).  This says nothing of a physical place of business, that is regular and established, and/or ratified by Google.  Providing digital telecommunications services to residents within a district, such as internet or telephone services, from a place outside the district does not qualify as a regular and established place of business.  *See Cray,* 817 F.3d at 1362 (explaining that the patent venue statute "cannot be read to refer merely to a virtual space or to electronic communications from one person to another.").

### b.      Third-Party "Megaport" Facilities and GCI

Uniloc 2017 points to the fact that another company called Megaport helps to facilitate the provision of two Google Cloud platform services to users.  Those services, Google Cloud Interconnect ("GCI") and Direct Peering, allow direct or very fast access to the Google Cloud network and Google servers.  Ex. Q, Cha Declaration ("Cha Decl.") ¶¶ 3, 8.  Uniloc 2017 alleges that "Google equipment at Megaport's facilities which provide the GCI and Direct Peering Services" are "fixed geographical locations"; "regular and established" because they operate in a "steady, uniform, orderly and methodical manner"; and "of the defendant" because Google holds contractual and/or property rights to use the space and maintain equipment.  Compl. at 17 (¶ 48).  The facts are otherwise.

First and foremost, Megaport is not Google—it is a different company.  Second, there is no "Google equipment at Megaport's facilities," as Uniloc 2017 asserts.  Megaport acts as an intermediary between Google and other companies using GCI and Direct Peering services.  Ex. Q, Cha Decl. ¶¶ 6, 8.  Companies can run a fiber line directly into the facilities of intermediaries like Megaport.  *Id.* ¶¶ 6, 8.  The intermediary then transfers data between the company and Google servers at PoPs, described above, that are located outside of this District.  *Id.* ¶¶ 4-5.  Google does not own any portion of Megaport or own or lease any of Megaport's facilities.  *Id.* ¶ 9.[8]  Nor does Google provide any equipment to Megaport, or maintain or locate any of its equipment at Megaport to facilitate Megaport's connectivity capabilities.  *Id.*  Google simply has no presence in, or connection with Megaport that would establish a "regular and established" place of business of Google under *Cray.*[9]

### c.     Repair Centers

Uniloc 2017 alleges that Google Pixel phone owners can bring or mail broken devices to repair centers operated by uBreakiFix and Cynergy.  Compl. at 18-20 (¶¶ 50-54).  Google does not own, own an interest in, or manage uBreakiFix or Cynergy, which are independent, third-party companies.  Nor does uBreakiFix exclusively repair Google products.  Instead, it acts as a national repair service for many   phone   manufacturers,   including   Apple   and   Samsung.   *See* https://www.ubreakifix.com/company/about.   Google does not own or lease space at uBreakiFix.  Moreover, Google has no property or inventory at uBreakiFix. All replacement parts are owned by uBreakiFix without any control by Google.  As for Cynergy, Uniloc 2017 points to a facility in Grapevine, Texas (Compl. at 19-20 (¶ 54)), which is located in the Northern District—not this District.

---

[8]  Megaport also does not own any facilities in the District, but rather has a relationship with another company— CyrusOne—that does.  Ex. Q, Cha Decl. ¶ 10.  Google has no more connection to CyrusOne than Megaport.  *Id.* ¶ 11.

[9]  Indeed, in the personal jurisdiction context, forum contacts of one company cannot be imputed to another.  *See Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (personal jurisdiction "must be met as to each defendant").  If the contacts of a third party do not suffice for personal jurisdiction, they *a fortiori* do not suffice for venue.  *See Cray,* 871 F.3d at 1361.

The fact that Google directs device owners to another separate, independent business for repair services does not establish that the repair center locations are Google's place of business. *Cf. Cray,* 871 F.3d at 1363 ("it must be [the] place *of the defendant* … not solely a place of the defendant's employee").

### d. Other Google Services

Uniloc 2017 points to various nationwide services as evidence of venue in this District, including Google Maps functionality; G-Suite services and Google Software-as-a-Service applications available through Google Cloud; and Waze's collection of traffic data. Compl. at 20-21 (¶ 55), 23-25 (¶¶ 61-62, 63), 26 (¶ 65), and 29 (¶ 12). These allegations amount to Google offering online services and collecting data via applications used by consumers nationwide, including within the District, but that does not make the Google application a Google place of business in this District. *See SEVEN Networks,* 315 F. Supp. 3d at 951 n.26 (dismissing the idea that "every handheld device sold by Verizon would become a place of business for Verizon" as "clearly … too far afield from the statutory text").[10]

The same goes for Google Express. *See* 2:18-cv-00491 Compl. at 21-23 (¶¶ 58-59). Google Express is a service that connects online users to popular retail stores to order the retailers' goods. Ex. R, Krause Declaration ("Krause Decl.") ¶ 4. Shoppers in this District can use Google Express, but Google has no employees, factories, warehouses, storage facilities or delivery fleets in the District to operate the service. *Id.* ¶ 5. Absent any physical property—real or personal—in the District, Google Express cannot constitute a regular and established place of business under *Cray.*

### e. Operations Outside the District and Pre-Suit

Uniloc 2017 also includes allegations regarding Google's "Presence in the State," irrespective of district. Compl. at 27-29 (¶¶ 1-12). For example, Uniloc 2017 identifies Google Fiber services

---

[10] For example, although individuals can use Google Maps on their personal devices while in this District, Google does not base or have any Street View cars dedicated to operate exclusively in the District.

provided in Austin and San Antonio, outside of this District.  *Id.* at 28 (¶ 8).  Google has also provided the State of Texas with aerial imagery and has digitized collections of books from public libraries, including at the University of Texas, Austin.  *Id.* at 29 (¶¶ 10, 11).  Again, there is no connection to this District and none that supports a "regular and established place of business" in this District.

Similarly, Uniloc 2017 points to office space and real estate that either are outside of this District or were closed by Google years before the complaints were filed.  Uniloc 2017 points to land purchased in Midlothian, Texas, Google offices in Austin, Texas, and an investment in a wind farm project in Oldham County, Texas.  *Id.* at 27-28 (¶¶ 2, 4-5, 9).  But all of these properties are located outside the District.  Google's activities outside the District have no bearing on whether Google should be subject to venue within the District.  And while Uniloc 2017 alleges that Google leased office space in Frisco, Texas from April 2012 to December 2013 (*id.* at 23 (¶ 60)), "[c]ourts determine venue under § 1400(b) by the facts and situation as of the date the suit is filed."  *Godo Kaisha IP Bridge 1 v. Intel Corp.*, No. 2:17-CV-00676-RWS-RSP, 2018 WL 5728524, at *2 (E.D. Tex. Aug. 29, 2018); *accord Personal Audio,* 280 F. Supp. 3d at 931.  Thus, the canceled lease on the office space in this District years before the lawsuit was filed has no bearing on whether venue is proper in this case.

Finally, Uniloc 2017 alleges that since 2007, Google has employed "hundreds" of employees in Texas.  *See* Compl. at 27-28 (¶¶ 3, 6).  This vague allegation, even if true, is insufficient to show that Google has a regular and established place of business specifically within the Eastern District of Texas.  And Uniloc 2017 does not present any evidence suggesting otherwise.

In sum, Google does not have any "place of business" in the Eastern District of Texas, much less one that qualifies as "regular and established" under the standards the Federal Circuit set forth in *Cray.*  None of the allegations set forth by Uniloc 2017 in its complaints support an argument otherwise.

**B.    Uniloc 2017 Cannot Establish a Nexus Between the Alleged Acts of Infringement and Google's Purported "Regular and Established Place of Business."**

Beyond showing that a defendant has a regular and established place of business, courts have also required plaintiffs to identify a relationship between that place and the alleged acts of infringement. *See Scaramucci v. FMC Corp.,* 258 F. Supp. 598, 602 (W.D. Okla. 1966) ("there must be some reasonable or significant relationship between the accused item and any regular and established place of business"); *see also Jeffrey Galion, Inc. v. Joy Mfg. Co.,* 323 F. Supp. 261, 266-67 (N.D. W. Va. 1971).   While *SEVEN* concluded otherwise, that requirement is consistent with the patent venue statute's history, *see Cray,* 871 F.3d at 1361 (noting § 1400(b)'s predecessor was passed to ensure "[j]urisdiction would not be conferred by '[i]solated cases of infringement' but 'only where a permanent agency is established'"), and essential if "regular and established place of business" is interpreted so broadly as to confer venue in any District a defendant's equipment is found or services used.

Uniloc 2017's fusillade of complaints illustrates this perfectly.  As shown in the chart below, of the 7 patents asserted and technologies accused in the December complaints, none is related to any more than two of Uniloc 2017's questionable venue allegations, most are related only to the most questionable of those allegations (e.g., web-based services accessible in the District or third-party facilities), and half of the venue allegations are unrelated to *any* case:

| Patent | GGC Servers | Google Fi / Voice | Google Cloud / Peering | Repair centers | Google Maps | Google Express | Texas Real Estate | G-Suite Services | Services (imaging; books; Fiber) |
|---|---|---|---|---|---|---|---|---|---|
| 6,253,201 | NO | NO | NO | NO | NO | NO | NO | ? | NO |
| 6,622,018 | NO | NO | NO | ? | NO | NO | NO | NO | NO |
| 6,628,712 | NO | NO | ? | NO | NO | NO | NO | NO | NO |
| 7,012,960 | NO | NO | ? | NO | NO | NO | NO | NO | NO |
| 9,564,952 | NO | NO | NO | ? | NO | NO | NO | NO | NO |
| 6,366,908 | NO | NO | ? | NO | NO | NO | NO | NO | NO |

Absent a nexus requirement, allowing plaintiffs to establish venue based on a presence as attenuated as those alleged here "could essentially reestablish nationwide venue, in conflict with *TC Heartland*, by standing for the proposition that owning and controlling computer hardware involved in some aspect of company business (e.g., transmitting data) alone is sufficient," *In re Google LLC*, 914 F.3d 1377, 1381 (Fed. Cir. 2019) (Reyna, J., dissenting from denial of petition for rehearing en banc).

### C.   Uniloc 2017 Insufficiently Alleged An Act Of Infringement In This District In The 550, 551, and 553 Cases.

In cases 2:18-cv-00550 ("550-case"), 2:18-cv-00551 ("551-case"), and 2:28-cv-00553 ("553-case"), Uniloc does not plausibly allege acts of infringement in this judicial district, and thus fails to meet its burden of demonstrating proper venue. *See In re ZTE (USA) Inc.,* 890 F.3d at 1013.

In the 550- and the 551-cases, the asserted patents claim activities and components of a video encoder for transmitting data. *See* Ex. S, '712  Patent (claim 1: "A device for switching (SW) . . . resulting in a compressed data output stream (OS)"; claim 2: "a transcoding System (TS) to provide the output stream . . . from the output of the commutation device"); Ex. T, '960 Patent (claim 4: "decoding" step ending with an "encoding" step).  In the 553-case, the asserted patent claims recite steps for extracting, indexing, and retrieving keyfacts from documents and user queries.  *See* Ex. U, '908 Patent (claim 6:  "A keyfact-based text retrieving method comprising:  keyfact extracting step for . . . ; keyfact indexing step for . . . ; and keyfact retrieving step for . . .").

In the 550- and 551- cases, Uniloc does not allege that Google makes, uses, sells or offers to sell servers or equipment relating to the accused Anvato/Google Cloud Media and Entertainment Solutions that run its purported encoding systems in the Eastern District of Texas. Similarly, in the 553-case, Uniloc does not allege that Google makes, uses, sells or offers to sell servers or equipment relating to the accused Google Search service that Uniloc alleges supposedly perform the claimed steps of

extracting, indexing, and retrieving keyfacts in the Eastern District of Texas.  In fact, Google does not maintain any data centers in this District. Ex. O, McCallion Decl. ¶ 3.

Although Uniloc generically alleges in Paragraph 6 of the complaints that Google has "committed acts of direct and indirect infringement in the Eastern District of Texas," this allegation is conclusory, lacks support and is a mere recitation of the statutory requirements to establish venue. Compare Dkt. No. 1, at ¶ 6, with 28 U.S.C. § 1400(b) & 35 U.S.C. § 271. Uniloc has not plausibly alleged direct infringement in this District in the 550-case, the 551-case, or the 553-case.

Further, Uniloc fails to plausibly allege that Google induced or contributed to infringement in the Eastern District of Texas in the 550-, 551-, and 553-cases. As discussed further in Part VI, these complaints do not allege pre-suit knowledge of the asserted patents. Because knowledge of a patent is necessary for both induced and contributory infringement, Uniloc has not plausibly alleged any indirect infringement at the time the complaints were filed in the 550-, 551-, and 553-cases.

In addition, Uniloc's complaints in the 550-, 551-, and 553-cases make bare allegations of indirect infringement that offer boilerplate language in support.  See 550-case Compl. at 44 (¶ 36); 551-case Compl. at 36 (¶ 31); 553-case Compl. at 43 (¶ 30), 44 (¶ 31).  In the 550- and 551-cases, Uniloc's indirect infringement allegations cite to Google webpages that generally describe Google Cloud Media and Entertainment Solution's video encoding capabilities. See 550-case Compl. at 44 (¶ 36); 551-case Compl. at 36 (¶ 31). Uniloc alleges these webpages serve as evidence that Google "directly and/or indirectly intentionally instructs its customers to infringe through training videos, demonstrations, brochures, installation and/or user guides."  See 550-case Compl. at 44 (¶ 36); 551-case Compl. at 36 (¶ 31). In fact, the end user or customer cannot infringe the patents asserted in the 550- and 551-cases (let alone in this District) because, to the extent they can be understood at all,  Uniloc's allegations are addressed to an encoding process that occurs on Google's equipment.  Similarly, the end user or

customer cannot infringe the patent asserted in the 553-case because, again to the extent Uniloc's allegations can be understood, they accuse keyfact processes that occur on Google's equipment.  *See* 553- case Compl. at 43 (¶ 30), 44 (¶ 31).  Google cannot induce or contribute to its own infringement. *See Global-Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 760-61 (2011) (Section 271(b) requires that the inducer lead or persuade another to infringe); *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 644 (Fed. Cir. 2017) (induced infringement requires "specific intent to encourage another's infringement'").

## V.      ALTERNATIVELY, THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA

Where venue is improper, as it is here, the district court "shall dismiss, or if it be in the interest of justice, transfer such [a] case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  Should the Court determine that it is in the interest of justice to transfer these cases for lack of venue rather than dismissing them, Google requests that the Court transfer the cases to the Northern District of California "because 'witnesses, evidence, the underlying events, and [the defendant] are based there.'" *See Moran v. Smith,* No. 5:15-CV-1121-DAE, 2016 WL 4033268, at *2 (W.D. Tex. July 27, 2016) (quoting *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013)). Specifically, (1) the case could have been brought in the Northern District of California as Google has a "regular and established place of business" in Mountain View, California, the location of its headquarters; (2) almost all the relevant evidence and witnesses are in California, including potentially relevant Google employees; and (3) the lawsuits "call[] into question the work and reputation" of Google and its employees that conduct business in the community, which gives the Northern District of California a unique interest.  *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009). Google will also be filing separate motions to transfer under 28 U.S.C. § 1404(a), elaborating on why transfer to the Northern District of California is appropriate.

## VI.     CLAIMS OF PRE-SUIT INDIRECT INFRINGEMENT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE KNOWLEDGE OF THE ASSERTED PATENT

Both induced and contributory infringement require knowledge of the patent allegedly infringed.  *See Corydoras Techs., LLC v. Apple Inc.*, No. 2:16-CV-00538-JRG, 2016 WL 9242435, at *1 (E.D. Tex. Nov. 23, 2016) (induced infringement claim "necessarily includes the requirement that [defendant] knew of the patent"); *Babbage Holdings, LLC v. Activision Blizzard, Inc.*, No. 2:13-cv-750-JRG, 2014 WL 2115616, at *2 (E.D. Tex. May 15, 2014) (dismissing claims for induced and contributory infringement based on failure to plausibly allege knowledge).  Uniloc 2017 does not even attempt to allege pre-suit knowledge in the 549, 552, and 553 cases, instead claiming only that "Google will have been on notice of the [asserted patents] since, at the latest, the service of [the] complaint[s]." *See, e.g.*, 549 case Compl. at 39 (¶ 32).  Thus, Uniloc 2017 has not alleged facts plausibly supporting the knowledge required for pre-suit indirect infringement and such claims should be dismissed.

## VII.     THE 549 CASE COMPLAINT SHOULD BE DISMISSED BECAUSE IT ASSERTS A PATENT DECLARED INVALID IN A FINAL JUDGMENT

Six months before Uniloc brought this action, twelve claims of the '018 patent were declared invalid, including the sole claim asserted in the Complaint (claim 1 of the '018 patent), in a final judgment entered in the Western District of Washington.  *See Uniloc USA, Inc. v. HTC Am., Inc.,* No. C17-1558JLR, 2018 WL 3008870, at *2 (W.D. Wash. June 15, 2018) (invalidating all asserted claims of the '018 patent).[11]  The final judgment of invalidity collaterally estops Uniloc's assertion of the same claim here.  *See Mendenhall v. Barber–Greene Co.,* 26 F.3d 1573, 1577 (Fed. Cir. 1994) ("once the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under principles of collateral estoppel").

---

[11] All of the '018 patent's claims were also recently invalidated in IPR proceedings.  *See* IPR2018-00394, 00395.

That the *HTC* judgment is on appeal does not save Uniloc's claims:  "Importantly, the collateral estoppel effect of a prior district court decision is not affected by the fact that an appeal has been taken from the decision."  *DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*, 70 F. Supp. 3d 808, 812 (E.D. Tex. 2014).  *See also Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.,* 170 F.3d 1373, 1381 (Fed. Cir. 1999) (observing "[t]he established rule in the federal courts . . . that a final judgment retains all of its res judicata consequences pending decision of the appeal" and "the uniformity of the rule in other circuits") (citation omitted).  The Court should dismiss Uniloc's claim here.

## CONCLUSION

For these reasons, the Court should dismiss this action for lack of subject matter jurisdiction, improper venue, and failure to state a claim or transfer it to the Northern District of California.

Dated: June 19, 2019              Respectfully submitted by,

*/s/ Michael E. Berta, with permission*
*by Michael E. Jones*
Michael A. Berta
(California Bar No. 194650
Michael.berta@arnoldporter.com
Arnold & Porter
10th Floor
Three Embarcadero Center
San Francisco, CA 94111-4024
Tel: 415-471-3100
Fax: 415-471-3400

David Caine (California Bar No. 218074)
David.Caine@arnoldporter.com
Telephone: (650) 319-4710
Bonnie Phan (California Bar No. 305574)
Bonnie.Phan@arnoldporter.com
Telephone: (650) 319-4543
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807

Nicholas Lee (California Bar No. 259588)
Nicholas.Lee@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4156

Nicholas Nyemah (DC Bar No. 1005926)
Nicholas.Nyemah@arnoldporter.com
Telephone: (202) 942-6681
Paul Margulies (DC Bar No. 1000297)
Paul.Margulies@arnoldporter.com
Telephone: (202) 942-6990
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

Mark Samartino (Illinois No. 6313889)
Mark.Samartino@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602-4321
Telephone: (312) 583-2437

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

**Attorneys for Defendant Google LLC**
**2:18cv548**


*/s/ Krista S. Schwartz, with permission by*
*Michael E. Jones*
Krista S. Schwartz
ksschwartz@jonesday.com
JONES DAY
555 California Street, Suite 2600

San Francisco, CA 94104
Tel: (415) 626-3939
Fax: (415) 875-5700

Michael C. Hendershot
mhendershot@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Tel: (650) 739-3940
Fax: (650) 739-3900

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

**Attorneys for Defendants Google LLC**
**2:18-cv-549**
**2:18-cv-552**


*/s/ Robert Unikel, with permission by*
*Michael E. Jones*
Robert Unikel
robertunikel@paulhastings.com
Michelle Marek Figueiredo (IL Bar #6297112)
michellemarek@paulhastings.com
Matthew Richard Lind (IL Bar #6327241)
mattlind@paulhastings.com
John A. Cotiguala (IL Bar #6311056)
johncotiguala@paulhastings.com
PAUL HASTINGS LLP
71 South Wacker Dr., 45th Floor
Chicago, IL 60606
Main: 312-499-6000
Facsimile: (312) 499-6100

Elizabeth Louise Brann (CA Bar #222873)
elizabethbrann@paulhastings.com
Ariell Nicole Bratton (CA Bar #317587)

ariellbratton@paulhastings.com
PAUL HASTINGS LLP
4747 Executive Drive, 12th Floor
San Diego, CA 92121
Telephone: (858) 458-3000
 Facsimile: (858) 458-3005

Robert Laurenzi (NY Bar #3024676)
robertlaurenzi@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue, 26th Floor
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 318-6100

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846
**Attorneys for Defendants Google LLC**
**2:18-cv-550**
**2:18-cv-551**


*/s/ David Perlson, with permission by*
*Michael E. Jones*
David Perlson
davidperlson@quinnemanuel.com
Charles K. Verhoeven
charlesverhoeven@quinnemanuel.com
Jonathan Tse
 jonathantse@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
50 California St., 22nd Floor
San Francisco, CA 94111
Tel: 415-875-6344
Fax: 415-875-6700

Deepa Acharya
deepaacharya@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP

1300 I Street NW, Suite 900 20005
Washington, D.C. 20005-4107
Tel: 202-538-8107
Fax:  202-538-8100

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

**Attorneys for Defendants Google LLC
2:18-cv-553**